The next case for argument is Geoscope Technologies v. Google, No. 24-1003. Mr. Ed Sheldon, are you ready? May it please the Court, Timothy Gilman from Sheltie Roth and Zabel on behalf of Appellant Geoscope. The patents on appeal here concern improvements to geolocation. As detailed in the complaint, specific improvements on how to take electronic signals of opportunity and use them to determine where a phone is. As laid out in the complaint, conventional approaches and in the specification suffered certain technological challenges due to having sparse reference points and having the irregular propagation of electronic signals in the environment. And the claims introduced a novel data structure called grid points that improves how the phones determine location by making it able to do it faster, more accurately, and using less computing resources. Given the 12C posture of this case, the District Court was required to credit these pleadings and these characterizations in the specification, and its failure to do so is reversible error here. Figure 6 from the patents, which is reproduced on page 19 of our brief, illustrates what these new data structures, these new grid points, are. It's not disputed that these are not the plain and ordinary meaning of the term grid point. These are a new type of data, a new type of grid, where you don't know the coordinates or the boundaries until you start to populate it with measurements. Now the District Court interpreted the word grid point and the word non-uniform grid point to mean the same thing, right? That's correct. They were largely treated coextensively below. Do you agree or have you challenged that claim construction? We have not challenged that claim construction. In the context of how grid point is used in the 753 patent, the 104 patent family always uses the term non-uniform grid point. In the context of how it's used in the 753 patent, it's essentially always going to be non-uniform as well, as is discussed in the specification as both the District Court and the parties... What was the District Court's interpretation of grid point and non-uniform grid point? Specifically, a grid point was a point associated with representative calibration data for an area. There are three separate aspects of it that are all tied together. As detailed in the District Court's claim construction opinion, there's no dispute that the term grid point means also an area, as well as being a point at the same time, and as well as this concept of having representative calibration data. The District Court was specific. That term that it used for the construction means having sufficiently statistically similar calibration data that is being fed into determining the coordinate and the boundaries of that grid point. I read the District Court's opinion as saying that the point about the novel data structure, that's not, in fact, recited in the claims, or a lot of the things that are being relied on as being, I suppose, an inventive concept or to satisfy LS Step 1 is not actually recited in the claim. What's your response to that? I think this is the second fundamental issue we had with the way that the District Court approached the issue, which was that it did not apply its claim construction that it had ruled on a few weeks before. It ruled on the 12C motion, and so it used a different concept of grid points for 12C than it had in the claim construction ruling. That was a fundamental error, too, that once you have the claim construction... How about if we do this then? Tell me, with the claim construction that the District Court arrived at, which you just told us, how is it that that claim construction makes it so you've satisfactorily recited the claim, the claim satisfactorily recite what you think is the inventive concept, being this novel data structure? The three different aspects of the claim construction, that it's a point, that it's associated with representative calibration data, and it reflects an area, are all tied together at the core, the heart of the invention, as shown, I think the best illustration of that is Figure 6, which we show in our brief, that you have an area where you don't know what the boundaries are until you start to populate it with measurement because the representative aspects, the representative calibration data... Where in the claim does it say that you have an area where you don't know what the boundaries are until you start filling it in? That is... We could look at, for example, 753 and Claim 1. Yeah, that is the order of the steps where you start with the calibration data and then you generate the grid points from the calibration data in combination with the District Court's construction, which we don't challenge, of what that term grid point means. That it has to be... You group the calibration data that you've measured in a way that there's statistical similarity between the points so that it makes the grid point that you're generating representative of those calibration points that you're grouping together. And that that, geographically, is illustrated in Figure 6, and that's what's going on in the process. And getting back to the initial point that Your Honor raised, that's why, if you do this with the types of signals that are claimed here, the types of signals of opportunity that are going to be propagating irregularly, you're going to get irregular boundaries, non-uniform boundaries, when you do the steps with the 753 patents, if you're performing them in a way to generate the grid points as claimed. Do I remember correctly that calibration data is the location data for another known location? Calibration data and the observed network measurements are a little bit more specific in this case, Your Honor, as the District Court construed. Calibration data, and this is at Appendix 2740, is construed as modified or unmodified network measurement data associated with a defined geographic location. And then network measurement data was defined on Appendix 2742 to be a measurement data from a network measurement report, i.e. a report used in cellular networks which provides the results of a measurement from a mobile device on one or more cells. So it's a very specific type of data that's being used from a particular source and that's fed into what the calibration data is. It's not used in a more generic sense, if that was Your Honor's question. And so in addition to the 12C issue of not crediting the allegations, the plethora of elements in the complaint, the fact that the District Court did not appear to use the claim construction it had just rendered in its 101 analysis is also error. I think this issue has come up and was disputed a little bit back and forth between the parties, but I think that this Court's jurisprudence is clear that if you have a claim construction, that should be applied in the 101 analysis. Whereas here that claim construction has an impact and an influence on what the 101 analysis is, it's important to perform that claim construction, which was done here. There's an issue that was raised by the other side about whether GS Cook waived the right to rely on the claim construction as part of the 12C analysis for 101. I don't think that that holds up here. The specific claim construction the Court had ordered was discussed extensively at the oral argument for the 12C motion. And it was also referenced in the briefing. I think the defendants were incorrect in their brief when they said to the contrary, in the briefing for the 12C motion at Appendix 2668 and 2670, GS Cook noted the interplay of the pending claim construction with the pending 12C motion, and I think this was a little bit unusual because it wasn't that there was a disagreement as to claim construction that would influence 12C. Both parties agreed at the claim construction phase that grid points had a very particular meaning, was not plain and ordinary. So here it was agreed that if it had a very particular meaning, that meaning then must have to be applied for the 12C analysis as well. And then once you have that construction, cases like McGrow and Enfish make clear that it's the terms as construed that claims as construed that then apply for the 101 analysis. And the pleadings go through in detail Appendix 265, 267 to 78, 274 to 75, the specific technological challenges of using these signals of opportunity to perform geolocation because they're not signals that are intended to be used for geolocation. So you have sparse reference points if you're using cell towers. The signals that they're sending out are going to be impacted by natural features like mountains, structures. They're not going to propagate in ordinary ways, which means that you're going to have to figure out a way to take irregular measurements that you then detect in the environment and then tie them back to do the geolocation, which is how you end up with this concept of grid points that create irregular patterns to make sense of the irregular data. And before I reserve my time for rebuttal, having reviewed the briefing, I don't think that there's a dispute that the particular approach that's shown in Figure 6 of the patents, a new type of grid that can be formed from the data, I don't think that there's a dispute that that can be patentable subject matter. That creating a regular grid that looks nothing like a grid that anybody would ever conceive of can be patentable subject matter if it's solving a technological challenge. If you're doing it in a way that you're grouping together disparate data points to create what is then comprehensible for geolocation but what looks completely irregular on a map that's not like any concept of grid that would exist in the art. I don't think that there's also either a dispute reading the briefs that the claims as construed require that new kind of grid, that that's what the construction of grid points, non-uniform grid point, mean. That you are creating a new grid that's based on what you're measuring, not applying a grid and then filling in the boxes with the measurements. And that to be able to do this with the complex data and at the speed and at the accuracy, to have it actually spit out for your cell phone, to be able to use geolocation for your cell phone which is now a fundamental aspect for almost all cell phone functions, that there's no analogous human activity that would have been known in the art or known before the patents. And I think when you tie those three together, that ends up being dispositive that this is a specific solution to a technological problem and therefore is patentable subject matter. Unless there are any questions, we reserve the remainder of our time. Thank you. Mr. Rosenthal. Thank you, Your Honor. I'm sorry, I have a frog in my throat. Excuse me. Thank you, Your Honor. May it please the Court. My name is Brian Rosenthal. I'm arguing on behalf of both the appellees in this case. The issue that is presented by this case is whether these broad, generic, functional claims that recite processing data in order to determine the location, whether they are saved from ineligibility by the fact that they mention grid points. Our view is that they are not. We think the District Court got it exactly right. First of all, the process of Step 1 should start with an analysis of the claim language itself. And if we look at the 753 patent as an example, those claims are virtually indistinguishable from the electric power case. Those claims recite providing calibration data, then generating grid points, then obtaining network measurement data, then analyzing that data, selecting certain of that data, and then determining a location. At no point . . . The invention at issue in this case is not the same invention that was at issue in electric power grid, right? That is correct. In electric power grid, the question was, or the invention in that case, was gathering all of this information from disparate sources, putting it together, and then using a technique that probably had never been done before to ultimately rely at a reliability indicator at the end of the claim. In this case, we have . . . Now we're talking about location. It's taking information from a variety of different sources, putting it all together, analyzing it, and coming up with a result, which is, in this case, the location. Now, that is no more or less technological than what was written down in the electric power grid. You're really relying on electric power grid, I think, for the breadth of the claim. Is that right? For an analogy on the breadth of the claim, that this claim . . . I mean, presumably, if the claim really did . . . was narrow enough to recite a technological improvement, then that really wouldn't depend on electric power grid, would it? I think the last part of your question is exactly right. If there was a how in this patent, if there was a how in the 753, electric power grid would be distinguishable. What I'm relying on electric power grid for is the fact that, like electric power grid, the claim elements are written at such a high level of generality. I suppose you could use the word breadth, but I really think that our point is it's generic, general, result-oriented language that does not provide any how. The other thing about it is that . . . Do you think the specification provides how? The specification provides a number of examples of how you might do that. In fact, in the 753, there's all kinds of figures, figure 49, 59, figure 40. There's all kinds of analysis about how you might determine grid points, generate grid points, how you might select grid points, how you might analyze grid points, how you might determine the location. Not a single piece of that is written in the claims or has been interpreted to be included in the claims. Geoscope has not appealed the court's claim construction. The court explicitly refused to bring into the claims any how the grid points are generated. In fact, in the claim construction, the district court explicitly said what the grid points are generated, whereas the claims merely recite that the grid points are generated. What we end up with, and this is why I say it's indistinguishable from electric power or automated location or any of those, or automation technologies, that all that it does is it recites, and I don't have to skip over any claim language to make this argument, it simply recites providing certain data, generating additional data, selecting some of that data, and then determining a location from that data. When you look at the language of the claims, it talks about using predetermined criteria, but it doesn't specify what those criteria are. It talks about characterizing parameters, but it doesn't tell you what those characterizing parameters are. It tells you you analyze the grid points or the calibration information as a function of the grid points, but it doesn't tell you what that function is. It is completely bereft of any particular specific improvement to the way that the computer works, and the problem that the claims are trying to solve is a distinctly non-technological problem, and that is determining where something is in the world. So this idea of grid points being used in that process is itself an abstract concept of determining location. I do want to address what Appellant essentially is resting its entire argument on, because it's really just incorrect. They are essentially resting their entire argument on the idea that grid points in the 753 patent must be irregular. In fact, I heard counsel say that they are always going to be non-uniform, and that was an argument that they made in their reply brief as well at page 14. In practice, they'll always be irregular. That is absolutely incorrect. Appellant below, during claim construction briefing, explicitly agreed that the grid points in the 753 include uniform grid points or non-uniform grid points. There's one dependent claim, I think, that refers to non-uniform grid points. Non-uniform grid points, it's the 104 Patent Claim 2. So there's two families of patents, and in the 104 patents, those dependent claims recite that the data in the database includes non-uniform grid points. So there's two different analyses here. In the 753, to start with that, it is absolutely clear that they can include uniform grid points. In fact, in the specification of the patent, at column 10, line 29, the patent explicitly states a non-uniform grid generator can be generated, and then it goes on line 32. It can be generated by a fixed uniform grid defined over the region. It explicitly states that this includes fixed uniform grids. Now, the 104 patent is different. The 104 patent does explicitly say that it is a non-uniform grid, but the district court below construed those terms to mean the same thing, and there is no dispute that that construction governs here. In the district court case, during claim construction, appellant agreed that those grid points include non-uniform grid points or uniform grid points. The other point is that even if, you know, what's going on here is that the appellant is trying to read all of this stuff in from a specification that is not actually claimed. In fact, counsel just said, figure six is the best illustration of these non-uniform grid points that he says are embodied. The figure six that he's referring to is from a different patent in a different family, the 784 patent, which is not on appeal here. That figure that they recite in their brief over and over as being the best evidence that this is a concrete invention is from a different family of patents. This patent and these claims are what are at issue here, and these claims, talking about the 753 first, merely require the use, the generic, unconstrained use of grid points. Now, the question is whether that use constitutes a concrete enough addition to a specific technological field, and the answer to that is no. Counsel said that what we've done here is we've claimed a novel, unique data structure, presumably relying on cases like ENFISH. That is not what's happening. The district court explicitly held at appendix, I think it's appendix 23 and 22, explicitly held in the 101 order that these claims do not require how you generate the grid points. They do not require that the grid points are a denser map of points than the cell towers, and specifically that there is no particular data structure that is required. Grid point was construed to mean an association of two things, an association of a point with representative calibration data. How you represent that in a computer is completely left up to the implementer. That's totally different from cases like ENFISH or UNILOCK or ADASA, those cases that are relied on in the briefs, where there was a specific change to how the computer operates. In these claims, there is no change, there is no improvement to how the computer operates. Instead, the claims recite using computers to gather and process data in a way that could be done with or without computers. Just looking at calibration data and grid points and determining from them a location is something that computers are not necessary for at all, and it certainly doesn't change or make any specific improvement to the way the computer operates, as is required in ENFISH. I do want to address one question that was raised prominently in the briefs and again today, and that is, did the district court err by not specifically reciting the claim construction? The answer to that is no, because every aspect of the district court's analysis in the 101 decision was consistent. This was a judge who had, just two weeks earlier, resolved the claim construction issues. All of the Federal Circuit cases that are cited say, if there is a claim construction issue that impacts the 101 analysis, that claim construction issue should be resolved before the 101 is resolved. Makes sense. That was done. The claim construction issues were resolved, and then this judge turned to the next issue, which was the 101 analysis, and everything in that 101 analysis was consistent with that decision that he had rendered two weeks earlier. What specifically is your response to the argument that the district court had a broader construction of grid points? I disagree, and first of all, the district court explicitly wrote out the construction of grid points in the claim construction order, and then during the 101 decision at Appendix 23, explicitly harkened back, not by reference to the claim construction decision, but specifically said, there is nothing in this claim. I'm going to quote instead of paraphrasing. Claim one recites a method that includes generating one or more sets of grid points without providing any limitation on how the grid points are generated. That is exactly the holding he had made just two or three weeks earlier. At Appendix 2785, during the claim construction order, the court said all of the arguments that Geoscope is making pertain to how the grid points are generated, but that's not in the claims. I am merely construing the word grid point, because that's the only thing that's been presented to me. So what we're left with is a claim that has plain language, English language, it's not technical language, so we can all understand it, that simply says provide calibration data, generate grid points for that calibration data. The district court has told us what grid points means. It's an association of one piece of data to another, and then analyze that data to determine the location. There is nothing in the claim construction. You could read the claim construction order over and over again, and there will be nothing in there that ever says that the claims are limited to how, and if there were any doubt about that, the court explicitly stated at Appendix 23 in the claim, in the 101 decision, that there is no recitation in the claims. And on Appendix 22, which is the page before that in the 101 decision, the court went even further and said at the top of the page, nothing in the claims requires the grid points to be arranged in a denser map, to be determined from the analysis of calibration data, or to be organized in any specific format. These are rulings that are entirely consistent with what the court had just ruled in the claim construction. There's no support anywhere in the Federal Circuit jurisprudence for the notion that the court's failure to explicitly cite the order that he had just issued in analyzing it means that we have to throw out that decision. The claim construction is clear. It resolved all the issues, and under that claim construction, there is no specificity that would render these claims concrete. I didn't really address Step 2 very briefly, nor did counsel, but in Step 2, there is nothing more to these claims that adds to that abstract concept of analyzing data, comparing data to determine a location, because there's nothing concrete. There's no new machinery. There's no new computer. There's no new database. The only thing that they point to, it always comes back to the same thing, grid points. And grid points just isn't enough standing by itself, nor is it in the 104 family. Merely by saying non-uniform grid points, that doesn't make it any more concrete. Those claims are even more abstract and generic than the 753 when you read those claims. All it says is that among the data are non-uniform grid points. So unless the court has any other questions, that's all I had to say. Thank you, counsel. Thank you. Mr. Gilman, you have about four minutes for rebuttal. Thank you, Your Honor. May it please the court. Starting with electric power group. As this court noted in electric power group, as part of its decision, the claims in this case do not even require a new source or type of information or new techniques for analyzing it at 1355. We believe that's entirely distinguishable here with the grid points, the non-uniform grid points, the fact that you have to have a point associated with a region associated with calibration data is the exact new type of information or new techniques for analyzing it that distinguishes electric power group. The fact that there might be different ways of doing it that are taught in the specification, as defendants acknowledged, there are specific embodiments of how you do those non-uniform grid points in the specification. But this court's case law is also clear that even on a one-to-one question, it's okay to have genus claims. McCrow decision specifically addresses that it's okay to have a class of factors that are used in calculations of morphing weights. Conica, excuse me, the claim that was found, patent eligible claim two, required modifying the permutation in time. That was the key element, the key limitation that was found to confer eligibility. It didn't say how you modify it in time, but the idea of modifying in time was what made the patent a concrete improvement. The incongruity between the claim construction decision and the one-to-one decision, I believe, is illustrated from what was just recited by counsel on appendix 22. For purposes of claim construction, the court required, and we believe properly, that grid point requires, a non-uniform grid point require associating a point and a geographic region, and that also ties together representative calibration data, which the court said required a level of statistical similarity to group it together. When the court then turned to the one-to-one decision, it treated grid points in a generic sense, that nothing in the claims require the grid points to be arranged in a denser map. I'll come to that in a second. But also nothing in the claims requires that the grid points be determined from the analysis of calibration data. That's directly contrary to the claim construction that says it has to be representative of the data that's being acquired. Nothing requires that grid points be organized in a specific format. Again, contrary to the claim construction that requires grid points to reflect both the point and the geographic region, as well as the representative data. The court never mentions the claim construction, and its opinion never addresses the argument. Can I ask you a quick question? The district court said that your claims rejected the abstract idea of determining a location based on data. Do you think it makes a difference if your claims are directed to determine location based on the relative location to known points, known locations? I would disagree with the characterization overall, but I do believe that the technique of generating that grid point, of filling in the map, and this gets to the denser map question about whether that's required by the claims, because we believe it is. If you generate these grid points to create new reference points, that that is a patent-eligible concept, especially the specific type of new reference points that are being added into the claim by the specific requirements. The specific type being non-uniform. Non-uniform, as well as that you're tying together the different characteristics as required by the claim construction. And the fact that this creates a denser location is explained at detail in our complaint, which again the court erred by not crediting it on 12C motion under Atrix and other parts of this court's jurisprudence, that it's required to credit the allegations that are pled in the complaint describing how the claimed grid points result in a denser map. But it's also a little bit self-evident that if you're creating these new grid points because of the technological challenges being confronted where you have sparse cell towers, if you create new reference points, you're necessarily creating a denser map because now you have more reference points, not just the cell towers that you're using to begin with. And so that's explained in detail in the complaint and the evidence that should have been credited, but it's also, I think, self-evident from the figures and from the specification. Just the point on Figure 6. Thank you, Mr. Goleman. You're out of time. The case will be submitted. Thank you, Ron.